IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 26, 2013

## MITCHELL DARNELL EADS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Claiborne County**
**No. 2011-CR-1023      E. Shayne Sexton, Judge**

---

**No. E2012-02232-CCA-R3-PC - Filed June 17, 2013**

---

The petitioner, Mitchell Darnell Eads, filed in the Claiborne County Criminal Court a petition for post-conviction relief, alleging that his trial counsel was ineffective by failing to object to the admission of certain evidence at trial and by erroneously stipulating at the sentencing hearing that the petitioner was a career offender. After a hearing, the post-conviction court denied the petition, and the petitioner currently appeals. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Clarence E. Pridemore, Jr., Knoxville, Tennessee, for the appellant, Mitchell Darnell Eads.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Lori Phillips-Jones, District Attorney General; and Jared Effler, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

At trial, a Claiborne County Criminal Court Jury convicted the petitioner in case number 12,019 of possession of contraband in a penal institution and felony escape. On direct appeal, this court summarized the proof adduced at trial as follows:

> On February 25, 2002, the [petitioner] was incarcerated on a felony charge at the Claiborne County Jail, located on the third floor of the Claiborne County Courthouse. At approximately 5:00 a.m., he forced Deputy Jailer Bryan

Ferguson at knifepoint to open the doors at the front of the jail, began running down the stairwell, and was apprehended at the foot of the stairs by deputies of the Claiborne County Sheriff's Department, whose office was located on the ground floor of the building. . . .

. . . .

Officer Steven Hurley of the Claiborne County Sheriff's Department testified that he heard the main entrance door to the jail open and shut, footsteps hurrying down the stairs, and Officer Bryan Ferguson's yelling something over the radio. He said that he followed Officer Beck out the door of the sheriff's office, saw the [petitioner] "rounding the stairwell heading out toward the gravel parking lot," and grabbed and held him against the stairwell. At about that time, Officer Ferguson, who was "shaking head to toe" and "pale as a ghost," came down the stairs shaking a can of mace. Officer Hurley testified that the officers recovered a "shank, . . . a metal hacksaw blade that had been filed off to a point and . . . had something wrapped around it for a handle," that the [petitioner] dropped when apprehended. He said that, after he and his fellow officers had handcuffed the [petitioner] and escorted him to the holding cell, they inspected the cell where the [petitioner] had been housed and discovered that the door appeared to have been sawed.

On cross-examination, Officer Hurley testified that both the stair treads and the large metal door at the top of the stairs were red and acknowledged that he knew of no other place in the courthouse with red paint. He further acknowledged that the [petitioner] never made it past the door to the sheriff's office. On redirect examination, he testified that the door that led to the gravel parking lot outside the sheriff's office was not a secure door and remained unlocked.

Officer Melvin Bayless of the Claiborne County Sheriff's Department testified that on February 25, 2002, he was in the sheriff's office with Officers Dennis Beck, Chris Bishop, and Steven Hurley when he heard the big red entry door to the jail open and shut, Officer Bryan Ferguson's voice over the radio

saying "Get him," and footsteps running down the stairs. He said he and his fellow officers went out the door and saw the [petitioner], whom they knew should not be down there, standing on the other side. He stated that Officers Beck and Hurley pinned the [petitioner] against the steps while he went "across the rail" to assist. As he did so, he saw the [petitioner's] weapon strike the brick wall and bounce down the steps. On cross-examination, he acknowledged that the [petitioner] came to a stop at sight of the officers.

Officer Chris Bishop of the Cumberland Gap Police Department, formerly a sergeant with the Claiborne County Sheriff's Department, testified that he and his fellow sheriff's department officers were in the office when they heard a noise, went outside, and saw the [petitioner] coming down the steps. He said that he yelled "weapon" as Officers Beck and Hurley grabbed the [petitioner] because he saw that the [petitioner] had a weapon in his left hand. The weapon was knocked to the ground, and he then picked it up and secured it as evidence. Officer Bishop identified the weapon, which he described as a hacksaw blade that had been sharpened into a point at one end and had a black trash bag braided into a handle on the other end. On cross-examination, he testified that the general public sometimes enters the courthouse through the door leading to the gravel parking lot outside the sheriff's office. He acknowledged he could not recall seeing red paint anywhere else in the courthouse other than in the workhouse and on the stairs leading to the workhouse.

Officer Missy Wright testified that she was a jailer with the Claiborne County Sheriff's Department and was working the night shift with Bryan Ferguson on February 25, 2002. She said that, at about 5:00 that morning, Ferguson went to awaken the trustees while she remained in the office. Five to ten minutes later, she heard keys at the kitchen door, glanced up, and saw him coming through the kitchen with the [petitioner] at his side. The next thing she knew, the [petitioner] had gone out the front door and a visibly shaken Ferguson was running into the office to get to the radio. On cross-examination, Wright acknowledged that the door that led to the gravel parking lot was generally used

-3-

only by the deputies or other individuals who were there "for workhouse purposes," and that the general public usually accessed the sheriff's department either through the main or side entrances of the courthouse. On redirect examination, however, she agreed that the general public was allowed to park in the gravel parking lot and that the door that led to the gravel parking lot remained unlocked.

Bryan Ferguson testified that he was formerly employed as a correctional officer with the Claiborne County Sheriff's Department but was discharged on August 8, 2002, for fraternizing with an inmate. He said that at approximately 5:35 a.m. on February 25, 2002, he went to awaken the trustees in cell two in the maximum unit. As he was walking past cell three, the [petitioner], who was standing at the cell door, said, "Open the red door." He continued past but then caught a glimpse of the cell door swinging open behind him and the [petitioner] approaching with a sharp object in his hand. He said that the [petitioner] placed the sharp object, a homemade knife, to his chest and told him not to do anything stupid. The [petitioner] then grabbed his right arm and pressed the knife to his side. Believing that the [petitioner] would kill him if he did not comply with his demands, Ferguson spent the next five to ten minutes attempting to open the red door, which led to the fire escape, but none of his keys fit the lock. He testified that the [petitioner] became agitated when the door would not open and ordered that he take him to the main entrance. The [petitioner] then escorted him, knife pressed against his side, to the front door of the jail, telling him as they passed his partner that he better not say anything or he would regret it.

Ferguson testified that he and the [petitioner] passed through the blue maximum security hallway door, the white bullpen hallway door, and the red wire mesh gate before finally reaching the main entrance door. The first two doors were unlocked, but he had to unlock the final two doors with his keys. When he unlocked the front door, the [petitioner] let go of his arm and "bolted out the door." On cross-examination, Ferguson agreed that he had become acquainted with some of the inmates during his employment at the workhouse and had dated a female

-4-

inmate who was serving a sentence on the weekends. He denied, however, that he fraternized with the woman while she was in the jail or ever gave anything to an inmate. He said that the stair treads leading to the jail were red for safety reasons and that he did not know whether red paint was used anywhere else in the courthouse. Finally, in response to jury questions read by the trial court, Ferguson testified that even though the jail was located in the courthouse it was considered a separate facility from the rest of the building, that the jail ended at the red entrance door, and that the courthouse was responsible for the stairs with the red paint.

The [petitioner] elected not to testify and rested his case without presenting any proof.

State v. Mitchell Eads, No. E2006-02793-CCA-R3-CD, 2008 WL 2790434, at *1-4 (Tenn. Crim. App. at Knoxville, July 21, 2008). The trial court sentenced the petitioner as a persistent offender to fourteen years for the possession of contraband conviction and as a career offender to six years for the felony escape conviction. Id. at *1. The court ordered the sentences to be served consecutively to each other and to a prior, twenty-four-year sentence, for a total effective sentence of forty-four years. Id. On direct appeal, this court affirmed the appellant's convictions but remanded for reconsideration of consecutive sentencing. Id.

On remand, the length of the petitioner's sentences remained the same, but the court ordered the sentences to be served concurrently with each other and consecutively to the prior sentence. State v. Mitchell Eads, No. E2009-01574-CCA-R3-CD, 2010 WL 3862566, at *1 (Tenn. Crim. App. at Knoxville, Oct. 5, 2010). On appeal, this court affirmed the petitioner's sentences. Id.

On March 8, 2011, the petitioner, acting pro se, filed a petition for post-conviction relief. The court appointed the petitioner counsel, and, thereafter, two amended petitions for post-conviction relief were filed. In the petitions, the petitioner complained that his trial counsel was ineffective on numerous grounds.[1] Notably, he first maintained that because a major issue at trial was whether he "left the confines of the jail" during his escape, counsel should have insisted that the State introduce "a certified blueprint of the jail" instead of the uncertified diagrams of the jail that were introduced as exhibits at trial. Second, the petitioner contended that during the sentencing hearing, counsel incorrectly stipulated that

---

[1]All but the two grounds discussed herein were abandoned on appeal.

the petitioner was a career offender.

At the post-conviction hearing, the petitioner's trial counsel testified that he was appointed to represent the petitioner in case number 12,019 and on three additional cases. Counsel said that during discovery, he received an uncertified copy of the jail's "fire escape plan" but that he could not recall if he tried to find "any certified blueprints or any actual architectural drawings" of the jail. The fire escape plan was consistent with the one counsel had seen posted in several places throughout the jail.

Counsel acknowledged that he did not object to the diagram of the jail admitted by the State at trial. He knew that the State would be allowed to describe the scene of the crime and would be able to use the diagram to demonstrate the scene. Counsel had been in the jail many times and thought the diagram "was consistent with the layout of the confines of that jail." Counsel was aware that at trial a fact question would be raised regarding the boundaries of the jail because the petitioner had been apprehended "at the bottom of the stairs just outside the sheriff's department's doors." Counsel said there were two ways to exit the jail: by using the fire escape or by going up a stairwell to the main exit. Counsel explained that "the main door in and out of that jail was red, and the only other place in that [c]ourthouse that had red was the treads going up the stairs to that red door." Counsel introduced photographs of that corridor at trial which, in his opinion, demonstrated that the petitioner had not completed his escape because he "never left the confines of that jail." Additionally, Officer Bishop testified at trial that the petitioner "never made it . . . out of the jail." However, counsel did not request that the trial court charge the jury on the lesser-included offense of attempted escape because the petitioner decided that he did not want the lesser-included offenses to be charged.

Counsel said that after spending considerable time reviewing the petitioner's prior criminal convictions, counsel concluded the petitioner was a career offender. At the sentencing hearing, counsel stipulated that the petitioner was a career offender on the felony escape conviction. Counsel advised the petitioner of the potential sentences he faced and encouraged the petitioner to accept one of the various plea offers made by the State.

Counsel said that the petitioner never disputed that he was a career offender. Counsel said that he "prepared a very comprehensive list of how to incorporate and include" convictions for offenses which occurred within twenty-four hours of each other and that he still concluded that the petitioner was a career offender. Counsel said that the petitioner had a series of prior criminal convictions in case numbers "10,526[;] 11,022[;] 11,023 and a plethora of more" that were used to classify the petitioner as a career offender. Counsel said that he "still [thought] to this day he's a career offender on that particular sentence at that time."

On cross-examination, trial counsel said that the State timely responded to his discovery request and that he reviewed the discovery materials with the petitioner. Counsel discussed trial strategy with the petitioner, investigated the case, and prepared for trial. Counsel "did not know then and do[es] not know now" if there are any "architectural drawings of the jail." He maintained that the drawings admitted at trial were true and accurate depictions of what they were purported to be and were admissible.

Counsel was certain that the petitioner was a career offender as it related to his escape conviction and a persistent offender as it related to his possession of contraband conviction. He said that "taking the 24-hour rule in a light most favorable to [the petitioner], he would've had at least eight prior felony convictions."

The petitioner testified that he thought trial counsel had been ineffective "in [determining] my classification range as it pertains to sentencing." The petitioner stated that by his calculations, he had four prior convictions that could have been used to establish his sentencing range, not the six convictions required to classify him as a career offender. He said that prior to his sentencing hearing, he told counsel that he "thought it was too much time."

On cross-examination, the petitioner acknowledged that trial counsel reviewed the discovery materials with him. He did not deny having the convictions that the State had compiled in a list included in the discovery materials. He also did not dispute the offense dates listed for the convictions.

At the conclusion of the hearing, the post-conviction court accredited the testimony of trial counsel. The court found that counsel was not deficient nor was the petitioner prejudiced by the actions of trial counsel. Therefore, the post-conviction court denied the petition. On appeal, the petitioner contests this ruling.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579

(Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

On appeal, the petitioner contends that trial counsel was ineffective in two ways: (1) counsel should have objected to the diagram of the jail because it was not certified and should have insisted on certified blueprints, and (2) trial counsel incorrectly determined that the petitioner was a career offender and stipulated his status at the sentencing hearing.

Regarding the petitioner's first complaint, we note that although the petitioner contended that trial counsel should have objected to the diagram of the jail, he did not submit the diagram or a certified blueprint at the post-conviction hearing to demonstrate any alleged disparity. There is nothing in the record that indicates the uncertified drawings were inaccurate. To the contrary, at trial Officer Hurley testified that the diagram was "a true and

accurate depiction of the Claiborne County Jail as it appeared" on the day of the petitioner's escape. Further, trial counsel testified at the post-conviction hearing that he had been in the jail many times and that the diagram "was consistent with the layout of the confines of that jail." See Tenn. R. Evid. 401, 901. The post-conviction court stated, "We don't have to have certified copies of everything as long as it gives the [j]ury an idea of what the jail would have looked like at the time of the alleged escape." The post-conviction court found that counsel was not ineffective in this regard. There is no evidence in the record to preponderate against the post-conviction court's finding.

Next, we turn to the petitioner's second complaint, which is that trial counsel erroneously stipulated that he was a career offender on the felony escape conviction. The petitioner's conviction for escape was a Class E felony. See Tenn. Code Ann. § 39-16-605(b)(2). At the time of the petitioner's sentencing hearing, Tennessee Code Annotated section 40-35-108(a)(3) provided that a defendant was a career offender when he had "[a]t least six (6) prior felony convictions of any classification if the defendant's conviction offense is a Class D or E felony." Further, Tennessee Code Annotated section 40-35-108(b) provided that

> (1) "Prior conviction" means a conviction for an offense occurring prior to the commission of the offense for which the defendant is being sentenced
>
> . . . .
>
> (4) Except for convictions for which the statutory elements include serious bodily injury, bodily injury, threatened serious bodily injury, or threatened bodily injury to the victim or victims, convictions for multiple felonies committed within the same twenty-four-hour period constitute one (1) conviction for the purpose of determining prior convictions

The petitioner argues that in State v. Blouvett, 904 S.W.2d 111, 113 (Tenn. 1995), "the State Supreme Court ruled that multiple convictions resulting from a crime spree that were adjudicated in a single proceeding could not be used to bump the sentencing range." In Blouvett,

> all of the charges . . . resulted from a crime spree which lasted approximately one month. All convictions, however, were adjudicated contemporaneously. The trial judge used the first "guilty plea" convictions to elevate the defendants' status first

to "multiple," then "persistent," and then to "career" offender in subsequent "guilty plea" convictions—all without reference to any conviction other than those which had been reduced to judgment in the same proceeding.

904 S.W.2d at 112. Regarding the convictions that were adjudicated on the same day, our supreme court concluded that the trial court erroneously enhanced the sentencing range for one conviction from a crime spree based upon other convictions that stemmed from the same crime spree. Id. The court explained "that 'prior conviction' means a conviction that has been adjudicated prior to the commission of the more recent offense for which sentence is to be imposed." Id. at 113.

At the post-conviction hearing, the petitioner agreed that the State provided a correct list of his prior convictions during discovery. The list reflects that on December 11, 1998, the petitioner was convicted of one Class E felony and four Class D felonies. On April 10, 1995, he was convicted of seven Class D felonies and two class C felonies. On December 7, 1994, he was convicted of six Class D felonies and three class E felonies. On November 11, 1994, he was convicted of one Class D felony. The petitioner asserts that based upon Blouvett, the foregoing convictions equate to four prior convictions for the purposes of determining whether he is a career offender because there were four, separate conviction dates.

However, the petitioner's reliance on Blouvett is misplaced. The petitioner does not complain that one or more of his instant convictions was used to enhance his range for another of the instant convictions; instead, his complaint is about whether trial counsel correctly calculated his sentencing range under Tennessee Code Annotated section 40-35-108(b)(4), which is "commonly known as the twenty-four-hour merger rule." State v. Kenneth Edward Watts, No. E2010-00553-CCA-R3-CD, 2011 WL 5517000, at *6 (Tenn. Crim. App. at Knoxville, Nov. 8, 2011), perm. to appeal denied, (Tenn. 2012). Trial counsel testified that based upon the *offense dates*, not the conviction dates, the petitioner had eight prior felony convictions, which classified him as a career offender on his conviction for felony escape. The record supports counsel's conclusion. We conclude that there is no evidence to preponderate against the post-conviction court's finding. Accordingly, we conclude that the post-conviction court did not err by denying the petition for post-conviction relief.

## III.  Conclusion

In sum, we conclude that the petitioner failed to establish that his counsel was ineffective.  Accordingly, we affirm the judgment of the post-conviction court.

_____
NORMA McGEE OGLE, JUDGE